```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:   9/30/2025
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

TATIANA BAKER,

                                    Plaintiff,

                    -against-

THE BRIDGE INC., et al.,

                                    Defendants.

23-CV-04416 (MMG)

**OPINION & ORDER**

MARGARET M. GARNETT, United States District Judge:

Plaintiff Tatiana Baker ("Plaintiff") brings this action against The Bridge, Inc. ("The Bridge") and two of its employees, Anthea Sutherland and Sheryl Silver (collectively, "Defendants"), asserting claims for employment discrimination and retaliation under both Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"), and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., along with analogous claims under the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. L. § 290 *et seq.*, and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-107 *et seq. See* Dkt. No. 1 ("Complaint" or "Compl."). Broadly, Plaintiff alleges that Defendants unlawfully refused to provide her with a fully remote work arrangement during her pregnancy. Plaintiff and Defendants have both moved for summary judgment on all claims. For the reasons that follow, Plaintiff's motion is DENIED, and Defendants' motion is GRANTED in its entirety.

## BACKGROUND

### I.    RELEVANT FACTS[1]

The Bridge is a mental health rehabilitation program that serves clients with behavioral issues, mental illness, and substance abuse concerns, helping them to develop independent living skills.  Pl.'s Rep. 56.1 ¶ 1.  Defendant Anthea Sutherland ("Sutherland") is a Senior Vice President of Human Resources for The Bridge.  *Id.* ¶ 8.  Defendant Sheryl Silver ("Silver" and, together with Sutherland, the "Individual Defendants") was the Senior Vice President for Community Support Programs at The Bridge from 2015 to July 2021 and Senior Vice President for Community Support and Outpatient Programs from July 2021 to the end of 2023.  *Id.* ¶ 12. Plaintiff is a healthcare professional who first joined The Bridge in 2019 as a Licensed Practical Nurse ("LPN").  Defs.' Rep. 56.1 ¶ 23.  After leaving The Bridge in November 2019 to briefly work for another healthcare provider, Plaintiff returned to The Bridge as a Registered Nurse ("RN") around March 30, 2020.  *Id.* ¶¶ 23, 26; Pl.'s Rep. 56.1 ¶ 18.  This case arises from Plaintiff's tenure as an RN.

---

[1] The following facts are taken from the parties' Rule 56.1 statements of material facts and the responses thereto.  *See* Dkt. No. 95-24, Plaintiff's Statement of Undisputed Material Facts ("Pl.'s 56.1"); Dkt. No. 96-2, Defendants' Statement of Undisputed Material Facts ("Defs.' 56.1"); Dkt. No. 98-2, Plaintiff's Counterstatement of Material Facts and Response to Defendants' Statement of Undisputed Material Facts ("Pl.'s Rep. 56.1"); Dkt. No. 99-2, Defendants' Response to Plaintiff's Statement of Undisputed Material Facts ("Defs.' Rep. 56.1"); Dkt. No. 101-1, Defendant's Response to Plaintiff's Counterstatement of Material Facts ("Defs.' Sur-Rep. 56.1").

In contravention of this Court's Individual Rules and Practices, the parties did not submit a joint Rule 56.1 statement, nor did they notify the Court in advance of their purported inability to comply with the Court's Individual Rules.  *See* Defs.'s Rep. 56.1 at 1 n.1.  Thus, to determine the universe of undisputed facts, the Court relies primarily on each side's objections to the other's stated facts.  In doing so, the Court disregards objections that are irrelevant, nonresponsive, conclusory, or unsupported by citations to admissible evidence, as well as responses that merely object to the inferences that may be drawn from the facts rather than dispute the facts themselves.  *See Reid v. Telentos Constr. Corp.*, No. 15-CV-2358-SJB, 2020 WL 6152494, at *2 (E.D.N.Y. Oct. 20, 2020).

**A.  The FACT Team**

In her second stint at The Bridge, Plaintiff worked as an RN on The Bridge's Forensic Assertive Community Treatment ("FACT") team.  Pl.'s Rep. 56.1 ¶¶ 3, 18.  As the name suggests, the FACT team practices Assertive Community Treatment ("ACT"), which provides comprehensive treatment, rehabilitation, case management, and support services to clients "whose needs have not been well met by more traditional service delivery approaches."  *Id.* ¶ 4.  The client population comprises individuals with "serious mental illnesses, high rates of co-occurring substance use disorders, and histories of criminal justice involvement," some of whom are on parole, on probation, or are recently released from incarceration.  *Id.* ¶ 3.  This population is generally considered "high needs" and "high risk" and includes individuals who may live on the streets, have a history of violent behavior, lack access to technology like a telephone, lack the ability to travel to see a healthcare provider, and have difficulty making and keeping healthcare appointments.  *Id.* ¶¶ 3, 37–38, 83.  Consequently, the FACT team provides much of its services directly in the community—that is, providers often must seek out their clients to deliver care outside of traditional clinic, office, or hospital settings.  *Id.* ¶¶ 3, 6, 29, 37–38.[2]

The FACT team is one of seven ACT teams at The Bridge, all of which are regulated by the New York State Office of Mental Health ("OMH").  *Id.* ¶¶ 19–20; Defs.' Sur-Rep. 56.1 ¶ 173.  The OMH sets staffing patterns for ACT programs, and the Bridge receives funding only

---

[2] Although Plaintiff nominally disputes these facts, her objections are generally unsupported by applicable citations to admissible evidence, and she disputes only the inferences to be drawn from the facts, not the facts themselves.  *See, e.g.,* Pl.'s Rep. 56.1 ¶ 38 (objecting to the fact that the FACT team's clients "do not have the ability to go to an office for an appointment to see a person a specified time, and often, employees from The Bridge must go into the community multiple times to try to find a client to give them medical care" by arguing that The Bridge could have arranged for Plaintiff to perform a role that did not include community work).  Plaintiff's submission in response to Defendants' statement of facts is replete with such improper objections, or efforts to substitute argument for factual recitations, which the Court will disregard without specific additional explanation as to each improper objection.  *See supra* note 1.

for the number of providers that OMH specifies.  Pl.'s Rep. 56.1 ¶ 21.  For the FACT team,

OMH specifies a "68-capacity model," which takes its name from the requirement to staff a

psychiatrist for the equivalent of 0.68 of full-time work.  *Id.* ¶ 24–25; *see also* Dkt. No. 96-20

("OMH Guidelines") at 23.   More specifically, the 68-capacity model calls for "one full-time

team leader, either .68 full-time psychiatrist or one full-time nurse practitioner, one full-time RN

and a minimum of .36 RN or LPN, one full-time program assistant, one full-time substance use

specialist, one full-time vocational specialist, and one full-time family specialist."  Pl.'s Rep.

56.1 ¶ 25.  With the exception of the psychiatrist/nurse practitioner, the OMH requires that the

FACT team "conducts a minimum of 80% of contacts in the community."  *Id.* ¶ 29.

### B.  Nursing Positions on the FACT Team

#### 1.      Nurse Roles and Staffing

The FACT team includes two nurses: one full-time RN and one part-time LPN.  *Id.* ¶¶ 25,

27, 30.  The OMH does not provide funding for additional nurse staffing.  *Id.* ¶ 26.  Each of the

six other ACT teams at The Bridge also include an RN, for a total of seven RNs on staff, but a

given RN can work full-time for only one team.  *Id.* at 31; Defs.' Sur-Rep. 56.1 ¶ 174.  At full

staffing levels, there are four LPNs shared between the seven ACT teams.  Defs.' Sur-Rep. 56.1

¶ 233.

#### i.    RN Responsibilities

The OMH Guidelines provide that the RN is "responsible for conducting [health]

assessments, assessing basic health and medical needs, coordinating health care with community

medical providers (e.g., primary care physicians, specialists, etc.), providing management and

administration of medication in conjunction with the psychiatrist/[Nurse Practitioner in

Psychiatry], providing a range of treatment, rehabilitation, education, and support services."

Def.'s 56.1 ¶ 28; *see also* OMH Guidelines at 27.  Health assessments involve checking the

clients' vital signs, discussing their medical complaints and history, and providing guidance, as applicable, on the management of their medical conditions. Pl.'s Rep. 56.1 ¶ 35. An RN's job duties include performing intramuscular injections. *Id.* ¶ 48.

Consistent with the OMH's requirements for ACT teams generally, the job description provided by The Bridge for the RN role specifies that the "essential position functions" include "[p]rovid[ing] 80 percent of treatment contacts in the community." Dkt. No. 96-10 at Defendants_0003–04; Pl.'s Rep. 56.1 ¶ 48. Additionally, under a section relating to travel requirements, the job description specifies that the RN position is "a field-based position and requires 80% of services to be provided in the community." Dkt. No. 96-10 at Defendants_0004.

### ii. LPN Responsibilities

Under the OMH Guidelines, LPNs are considered paraprofessionals, a classification of staff who "may carry out rehabilitation and support functions; assist in treatment; provide substance abuse services; provide education, support, and consultation to families; and provide crisis intervention services." OMH Guidelines at Defendants_001816. LPNs can perform some of the functions of an RN, such as administering injections. *See* Dkt. No. 95-2 ("Silver Dep., part 1") 84:23–85:15; 89:24–90:05. However, LPNs cannot complete health assessments on their own. *See* Dkt. No. 95-6 ("Baker Dep.") 71:21–23 ("Q: Tell me what an RN can do that an LPN cannot. A: Health assessments."); *id.* 73:15–18 ("Q: Is anybody else other than yourself capable of performing a health assessment on the FACT team? A: No."); *id.* 80:9–14 ("[The LPN] can take vital signs and she can document vital signs, she couldn't document the [health assessment] questionnaire."). This is because only professional staff, such an RN, may complete health assessments without supervision. Dkt. No. 95-1 ("Vindeni Dep.") 76:20–77:12; *see also* OMH Guidelines at Defendants_001770–71 ("Assessment services are provided by professional staff and paraprofessional staff under the supervision of professional staff.").

5

### 2.  Plaintiff's Hiring as the RN for the FACT Team

Around March 30, 2020, Plaintiff rejoined The Bridge as the RN for the FACT team.
Pl.'s Rep. 56.1 ¶ 51.  At that time, the team's only LPN was Antoinette Chapman.  *Id.* ¶ 33.
Prior to her rehiring, Plaintiff interviewed with Sophia Vindeni, then the program director for the
FACT team (and Plaintiff's supervisor once Plaintiff started).  *Id.* ¶ 47; Vindeni Dep. 30:10–19.
Plaintiff understood at the time of her interview that the RN position included responsibilities for
fieldwork and that 80 percent of treatment contacts must be provided in the community.  Pl.'s
Rep. 56.1 ¶¶ 49–50.

### C.  The COVID-19 Pandemic

Plaintiff started her RN position in the early days of the COVID-19 pandemic.  *Id.* ¶ 52.
On March 18, 2020, a few weeks before Plaintiff's start date, the New York City Department of
Health and Mental Hygiene ("DOHMH") issued guidance regarding the provision of services
during the pandemic.  *Id.* ¶ 39.  The guidance stated that the delivery of essential services, which
included the FACT team's services, "should be delivered remotely as much as possible" and "for
services that cannot be delivered remotely . . . providers that typically go into the community are
expected to continue to make community visits/outreach" with precautions.  *Id.* ¶¶ 40–41.

During the next year, while the pandemic was at its peak, Plaintiff worked some days
remotely and some days in the field, where she performed health assessments, among other
duties.  *Id.* ¶¶ 53–54.  She never worked under a fully remote arrangement, although there may
have been individual weeks where she did not work in the field at all.  *Id.* ¶ 57.

On April 28, 2021, Vindeni sent an email to Baker and other employees at The Bridge
regarding a "Return to Fieldwork."  *Id.* ¶ 59; Dkt. No. 96-16 at Defendants_001696.  The email
attached a letter from Silver, who at that time was the Senior Vice President for Community
Support Programs at The Bridge.  Dkt. No. 96-16 at Defendants_001697; Pl.'s Rep. 56.1 ¶ 12.

The letter informed staff that "[b]eginning July 1, 2021, all staff in Community Support Programs (Care Coordination, ACT and Pathway Home) will be expected to work on-site or in the field 5 days per week." Dkt. No. 96-16 at Defendants_001697. Silver's letter and Vindeni's email clarified that while five days of fieldwork may not be necessary every week, field-based staff were still expected to be available for field work five days per week. *Id.* at Defendants _001696–1697. As the full resumption of field work was not set to begin until July 1, 2021, Vindeni noted in her email on April 28, 2021, that "[a] return to the office is not required at this time." *Id.* at Defendants_001696.

On July 1, 2021, DOHMH issued updated provider guidance regarding the COVID-19 pandemic, replacing the guidance previously issued on March 18, 2020. Pl.'s Rep. 56.1 ¶ 64. The updated guidance stated that "at this point in the pandemic, all DOHMH contracted and subcontracted providers are expected to offer the full array of essential and non-essential aspects of their scopes of service both in person and virtually" and "decisions about the use of telehealth or in-person service delivery should be driven by person-centered service planning and informed by sound judgment, including an assessment of clinical risk." *Id.* ¶ 65.

**D. Plaintiff's Accommodation Request**

Plaintiff learned she was pregnant in approximately May 2021. *Id.* ¶ 61. In approximately July 2021, she told Vindeni and Chapman about her pregnancy but informed no one else at The Bridge outside of the FACT team. *Id.* ¶¶ 62–63. She met with Vindeni over Zoom for a supervision meeting on July 22, 2021, the same month that The Bridge's community support teams were expected to have resumed full availability for in-person field work. *Id.* ¶¶ 60, 66. During the meeting, Vindeni wrote in her notes that Plaintiff will "return[] to field 5 days a week. Willing to do Wednesday telehealth and work Mon/Tues and Thurs/Fri starting

7/26. September, when kids are in school, will be in the field 5 days a week – starting week of
9/7." *Id.* ¶ 67.

### 1.    The First Doctor's Note and Plaintiff's September 9 Email

On September 8, 2021, Plaintiff obtained a note from her doctor, Lauren Ferrara (the
"First Doctor's Note"), stating, "This letter is in reference to Ms. Tatiana Baker who is under our
care for her pregnancy.  At this time I am recommending she work remote only.  She will
continue to be assessed for the duration of the pregnancy." *Id.* ¶ 68.  The letter provided no
medical basis for the recommendation as to remote work.  The next day, Plaintiff attached the
First Doctor's Note to an email to Vindeni, Asif Kamalodeen (The Bridge's payroll coordinator),
and Florence Biriwa (The Bridge's human resources benefits manager) (the "September 9
Email"), writing:

> Good morning, I had a Dr. appointment yesterday, please see attached letter
> from my provider putting me on restricted work (remote only) until further
> notice. For any further clarification I provided her information more clearly
> in the second attachment. If necessary, let me know [if] you need anything
> further from me or my provider.

*Id.* ¶ 69.  From that point on, Plaintiff stopped working in the field.  *Id.* at ¶ 72.

### 2.    Silver's September 14 Email

About twenty minutes after Plaintiff sent the First Doctor's Note, Vindeni forwarded
Plaintiff's email to Vindeni's supervisor (Alison DeHaven) and Silver.  *Id.* ¶ 70.  Noting the
imminent departure of Antoinette Chapman from the LPN position, Vindeni advised that the
team would "definitely need assistance from other team RN's" and asked how to proceed.  *Id.*
¶¶ 70–71.  A few days later, Silver sent an email to Plaintiff (the "September 14 Email"), stating:

> Hi Tatiana. I hope you are doing well. Unfortunately, we are not able to
> accommodate your request to work remotely. The RN position on the ACT
> team is a fully in-person, community-based position. If you are not able to
> return to in-person work on a full-time basis due to a medical condition, our

suggestion is you consider applying for FMLA. Please be in touch with Florence in HR for additional information and guidance. Take care."

*Id.* ¶ 73.  Around this time, Florence Biriwa called Plaintiff and told her that The Bridge would not provide her requested accommodations.  *Id.* ¶ 76.

### 3.  The September 17 Zoom Meeting and Plaintiff's Grievance

Plaintiff "logged into a Zoom meeting with the FACT team" on September 17, 2021.  *Id.* ¶ 77.  Vindeni alerted Silver by text and asked what to do, stating that she "was under the impression that [Plaintiff] was unable to work remotely."  *Id.* ¶ 78.  Silver responded, "She is not able to work remotely.  She should take a sick day."  *Id.* ¶ 79.  Prompted by Vindeni, Silver called Plaintiff and told her to log out of the meeting because The Bridge was unable to accommodate her request for full-time remote work."  *Id.* ¶¶ 80–81.  After Silver told her to exit the Zoom meeting, Baker contacted her union representatives and asked them to file a grievance on her behalf.  *Id.* ¶¶ 86–87.  The Bridge placed Plaintiff on unpaid administrative leave on September 24, 2021.  Defs' Sur-Rep. 56.1 ¶ 197.  A union grievance was filed on Baker's behalf on September 26, 2021.  *Id.* ¶ 199.

### 4.  The Referral Moratorium

On October 18, 2021, Vindeni emailed OMH to request a moratorium on referrals to the FACT team, stating the FACT team could not accommodate new referrals because it did not have an RN or LPN on staff.  Pl.'s Rep. 56.1 ¶¶ 89, 91.  She wrote:

> from 9/24/21 to 10/14/21, The Bridge Director of Nursing (an RN) was assisting FACT by providing coverage three days a week. At her unexpected leave from The Bridge, the FACT team has been relying on assistance from RN's [sic] and LPN's [sic] from other Bridge ACT teams. Though the other Bridge ACT teams have been supportive and immensely helpful, we are diligently working to fill both of the FACT nursing positions to provide more comprehensive medical coverage to FACT consumers. Due to the high medical need with the population we serve, it is in the best interest of the team that we pause new referrals at this time.

*Id.* ¶ 92.  The moratorium also suspended the performance of health assessments indefinitely.  *Id.*

¶ 95.  The Bridge hired a new RN for the FACT team in December 2021, and health assessments

resumed.  *Id.* ¶ 96.

### 5.  Defendants' Offers for Alternative Work Arrangements

Following Plaintiff's union grievance, Defendants and Plaintiff engaged in a back-and-

forth throughout November and December 2021, which produced a series of proposed alternative

work arrangements that Plaintiff rejected.

#### i.  Sutherland's November 10 Email

On November 5, 2021, Baker and her union representative met with Sutherland,

Silver, DeHaven, and a social worker from the Bridge regarding the September 26

grievance.  *Id.* ¶ 97.  On November 10, 2021, Sutherland sent an email to Baker (the

"November 10 Email"), stating:

> Dear Tatiana: I hope you are well. I am following up on our conversation
> regarding reasonable accommodation due to your pregnancy. I have your
> doctor's note indicating that at this time your doctor is recommending remote
> work only and you would be reassessed during the course of your pregnancy.
> Please respond to the questions below to assist me in understanding what you
> are asking for:
>    1.    What is your due date?
>    2.    Will you be able to resume community work at any point in your
>          pregnancy?
>    3.    Would you be able to work in a different position that does not
>          require community work but would require you to physically
>          report to work in an office?
>    4.    Are there other accommodations that might meet your needs
>          during your pregnancy? If yes, what are they?

*Id.* ¶ 98. On November 12, 2021, having not received a response from Plaintiff, Sutherland

emailed Plaintiff again, writing "Good Morning Tatiana:  Please respond to my e-mail below so

that I can work on your accommodation request."  *Id.* ¶ 100.

Plaintiff responded later that day. *Id.* ¶ 102. For Sutherland's first question, Plaintiff specified her due date as February 26, 2022. *Id.* For the second question, she wrote, "My doctors note still stands as of today for the capacity which I'm able to work." *Id.* For the third question, she wrote, "I would not know as I don't know which position you are offering me as no offer has been made yet for an accommodation. If you send me positions that align with my provider[']s recommendations I may be better equipped to answer this question." *Id.* And for the fourth question, she wrote, "The accommodations listed from my provider during my pregnancy are the recommendations I intend to follow."

### ii. Sutherland's November 18 Email

Sutherland responded to Plaintiff on November 18, 2021 (the "November 18 Email"). *Id.* ¶ 104. She wrote:

> Dear Tatiana:
> Thank you for providing your due date. Your answers to our November 12 request for additional information do not provide sufficient information and/or sufficiently cooperate with us concerning the accommodation, which has caused a breakdown in the interactive process. Nevertheless, we have carefully considered your request for accommodation, and are offering you the following options:
> 1. Continue working in your RN position on the ACT Team. We can accommodate three remote days and two days in working in the community; or
> 2. Transfer to the Residential Services Department for the remainder of your pregnancy and work at the Tilden Avenue program located at 2513 Tilden Avenue in Brooklyn. You would physically report to that program daily to fulfill a RN position there. This position does not include any community work. If you are interested in learning more, I will provide the job description and work schedule.

*Id.* Plaintiff replied to the November 18 Email on November 19, 2021, stating that she disagreed with the characterization of her responses and that she remained willing to provide any information that Sutherland believed to be missing. *Id.* ¶ 106. She further stated, "It is extremely dangerous for me to work any days in the community given my current medical

conditions and concerns. The Tilden location is a two hour commute for me each way on a good day and is dangerous and not practical." *Id.* ¶ 105.

### iii. Sutherland's December 9 Email

Sutherland responded to Plaintiff on December 9, 2021 (the "December 9 Email"). *Id.* ¶ 108. In the email, Sutherland reiterated that an "essential requirement" of Plaintiff's job is to provide services in the community and that Plaintiff's request to work remotely full-time "is not possible" for the RN position. *Id.* Recounting the two offers from the November 18 Email, Sutherland wrote that Plaintiff had declined the proposed temporary transfer to the Residential Services Department because the commute was too long and had declined to work partially remotely in her current position because "it is too dangerous to work any days in the community." *Id.* Sutherland then explained yet another proposed alternative work arrangement for Plaintiff:

> After much consideration, we have decided to temporarily restructure your duties so that you would perform your community work in the office, instead of travelling around to different locations in the community. We are offering you the ability to perform your RN duties out of the FACT office, which is your assigned home office. This would require you to report to the office three days weekly and to meet with your clients in the office instead of the community. This would be a temporary arrangement limited to the duration of your pregnancy. You would work remotely two days weekly . . . . Please let us know if this arrangement is acceptable to you.

*Id.* That is, the arrangement offered in the December 9 Email would have allowed Plaintiff to commute to her usual office three days per week, see her clients there, and then work remotely the other two days per week. *Id.* ¶ 113. To accomplish this arrangement, other staff members from The Bridge would have "had to drive into the community, locate the clients, and drive them

to the office" to be seen by Plaintiff.[3]  *Id* ¶ 114.  The Bridge had never previously arranged for staff members to drive clients to The Bridge's offices to meet with an RN.  *Id.* ¶ 117.

### iv.          Sutherland's December 30 Email

Plaintiff responded to the December 9 Email on December 29, 2021, writing, "Per your last email regarding any work accommodation, please see below an updated letter from my provider.  Please send me your acceptance or declination of this recommendation from my doctor."  *Id.* ¶ 118.  The letter was from Dr. Ferrara and was dated December 28, 2021 (the "Second Doctor's Note").  It stated, "[Plaintiff] is currently 31 and 2/7 weeks.  She is cleared as of today to return to split shifts, two times per week."  *Id.* ¶ 119.

Sutherland responded the next day (the "December 30 Email"), offering Plaintiff "the opportunity to return to FACT or to go to Manhattan Shelter ACT at 72 W. 125th Street, if that would be more convenient."  *Id.* ¶ 120.  Sutherland also asked Plaintiff to clarify the meaning of the Second Doctor's Note.  *Id.*  Sutherland explained that if "split shifts, two times per week" referred to the prior offer for Plaintiff to work three days per week in the office and two days per week in the field (presented in the December 9 Email), then The Bridge would agree to that arrangement.  *Id.*

Plaintiff responded later in the day on December 30, 2021, writing "My doctor[']s recommendation is to work a split shirt [*sic*] in office twice a week dividing the 7 hour work day

---

[3] Plaintiff objects that this fact is "demonstrably false" based on testimony from Sutherland regarding one of The Bridge's residential programs.  *See* Pls.'s Rep. 56.1 ¶¶ 114–17.  In that program, nurses provide care in the office instead of in the community, but no client transportation is necessary because the clients live onsite.  *See id.*; Dkt. No. 95-5 ("Sutherland Dep.") 107:15–108:21.  However, Sutherland's testimony plainly does not relate to the proposal in the December 9 Email whereby Plaintiff would stay on the FACT team and see clients in the office.  Rather, it refers to the position in the Residential Services Department (an entirely separate department from the FACT team) that was offered to Plaintiff in the November 18 Email, and rejected by her due to the length of the commute.  *See* Sutherland Dep. 107:15–108:21 (discussing offering Plaintiff "an RN position in one of the residences," which "was in an entirely different division" and had become vacant).

13

to be partially in the office and partially from home in a single day.  And three days completely remote." *Id.* ¶ 122.  The email continued, "This is not to be confused with field work.  I'm not able to resume field community work at this time at all." *Id.*

Sutherland responded to Baker on January 10, 2022, asking how many hours Plaintiff would work from the office, how many hours she would work from home, how long her commute would be and whether her commuting time would be factored into her workday, and how many clients Plaintiff would be able to see each day that she worked in the office. *Id.* ¶ 123.  Plaintiff alleges she responded to Sutherland's January 12, 2022, but Sutherland testified that she did not receive the email, nor could The Bridge's IT department find the email in The Bridge's system. *Id.* ¶ 125.

### E.  Plaintiff's FMLA Leave and Unfulfilled Return

Plaintiff applied for FMLA leave on March 4, 2022. *Id.* ¶ 128.  Vindeni and Biriwa approved the leave, effective from February 13, 2022 to May 9, 2022. *Id.*  On May 6, 2022, Plaintiff emailed Sutherland and stated that she wanted to return to her prior role on May 23. *Id.* ¶ 129.  Sutherland responded later that day, advising that Plaintiff needed to submit a certificate from her doctor confirming her fitness to return to work. *Id.* ¶ 130.  Additionally, Sutherland informed Plaintiff that she would be assigned to an RN position in a different ACT program in Manhattan upon her return. *Id.* ¶ 130.

Plaintiff asked why she would not be returning to her prior role, and Sutherland explained that The Bridge needed to fill Plaintiff's position during her leave, but that it would place Plaintiff in an equivalent position. *Id.* ¶¶ 130–31.  Plaintiff asked, "Wouldn't it be plausible to float the newer nurse to the equivalent position and allow me to return to my original position post maternity leave?" *Id.* ¶ 133.  On May 13, 2022, Sutherland answered, "Due to the length of your absence and the critical need to provide the clients in the FACT program with in-person and

14

face-to-face services, the RN position on that team was filled." *Id.* ¶ 134. She continued, "To provide continuous, uninterrupted face-to-face in-person services to clients, we believe it would be more beneficial to maintain the nurse who has been servicing those clients for the last several months and to place you in an identical position on the Manhattan Shelter ACT Team." *Id.* She added that Plaintiff's schedule and salary would not change and that her commute would decrease by approximately ten minutes. *Id.* She asked Plaintiff to confirm that she would return to work on May 23, 2022. *Id.*

Sutherland followed up on her previous email on May 18, 2022, and Plaintiff responded later that day. *Id.* ¶ 135–36. Plaintiff advised that she had not yet received the required clearance from her doctors and asked whether she could start without it. *Id.* 136. She again protested the decision to place her in the Manhattan position, writing:

> It's also disheartening to hear I'm unable to return to my team postpartum after working with them since 2020. After having a baby I have been faced with many changes and I expected to return to a familiar environment and be able to return to my job duties where I was hired and worked for quite some time. However if this is the protocol of the company, for women who go on maternity leave to fill their positions and then move them elsewhere upon their return to work then I guess I have no choice but to return to the equal position being offered not because it's advantageous for me, but rather for the company.

*Id.* Sutherland informed Plaintiff she could not start without a certificate of fitness from her doctor, and she offered to extend Plaintiff's temporary leave until she could obtain and submit the certificate. *Id.* ¶ 137. She asked Plaintiff to update her in a week. *Id.*

After Sutherland followed up on May 27 and June 7, Plaintiff emailed Sutherland on June 16, 2022. *Id.* 138–41. She wrote:

> Good afternoon, I initially believed I could return to work however due to the discriminatory treatment I received during pregnancy and now experiencing discrimination currently postpartum with trying to persuade me to work at another site I'm uncomfortable returning. I have experienced increased

15

> anxiety and depression and I have no choice but to seek out alternative
> employment. Let me know if you are willing to accommodate my prior
> request at which point I will take that under advisement.

*Id.* ¶ 141.  In response, on July 14, 2022, Sutherland reiterated her prior points regarding the need

to fill Plaintiff's vacant position on the FACT team and the suitability of the position with the

Manhattan Shelter ACT Team.  *Id.* ¶ 142.  She also asked Plaintiff to confirm whether she was

planning to return.  *Id.*  Plaintiff has not returned to The Bridge, and the parties dispute whether

her placement on unpaid leave on September 24, 2021, amounted to a termination.  *See id.* ¶ 143.

### F.  Plaintiff's Other Employment

Around January 2021, Plaintiff began working for ProMed Staffing Resources

("ProMed") as an RN at a COVID shelter.  *Id.* ¶¶ 144–46.  She worked in-person at ProMed

throughout her pregnancy and while she was employed by The Bridge.[4]  *Id.* ¶¶ 147–49.  On

November 22, 2021, she began working at Community Healthcare Network as an RN Care

Coordinator.  *Id.* ¶¶ 154–55.  She worked at least partially remotely at Community Healthcare

Network while she was employed by the Bridge.  *Id.* ¶ 156.

## II.    PROCEDURAL HISTORY

Plaintiff commenced this action on May 25, 2023.  The Complaint asserts eleven causes

of action: (1) discrimination under Title VII; (2) retaliation under Title VII; (3) discrimination

under the ADA; (4) retaliation under the ADA; (5) discrimination under NYCHRL; (6) aiding

and abetting discrimination under NYCHRL; (7) retaliation under NYCHRL; (8) vicarious

liability for discrimination under NYCHRL; (9) discrimination under NYSHRL; (10) retaliation

---

[4] It is undisputed that Plaintiff was working in-person elsewhere while representing to Defendants
that she could not perform in-person work at The Bridge.  The natural inference is that Plaintiff's
accommodation request was contrived.  However, in light of the underdeveloped record on this point, and
because the Court disposes of Plaintiff's entire case on other grounds, this Opinion does not address
Defendants' argument that Plaintiff's claimed restrictions were illegitimate.

under NYSHRL; and (11) aiding and abetting discrimination under NYSHRL.[5]  Compl. ¶¶ 59–106.

Upon Defendants filing their answer on July 11, 2023, the case was automatically referred to mediation pursuant to the Court's Standing Administrative Order regarding counseled employment discrimination cases, but mediation proved unsuccessful.  *See* Dkt. Nos. 19, 22, 28.  The parties commenced discovery in the meantime, which developed into a protracted and arduous process that finally ended in June 2024 after numerous extensions and disputes requiring intervention from the Court.  *See* Dkt. Nos. 31–32, 35, 37–38, 40–41, 44–45, 50–54, 69.  On August 27, 2024, the Court denied Defendants' request to reopen discovery for the purpose of obtaining Plaintiff's employment records from ProMed.  *See* Dkt. No. 84.

Plaintiff and Defendants both moved for summary judgment on October 15, 2024.  Dkt. Nos. 93, 96.  Each movant opposed the other's motion on November 11, 2024, Dkt. Nos. 97, 99, and submitted a reply in support of their own motion on November 22, 2024, Dkt. Nos. 100, 101.

## DISCUSSION

### I.    STANDARD OF REVIEW

A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).[6]  A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if

---

[5] The Complaint ambiguously and inaccurately specifies which causes of action apply to which Defendants.  For example, the First and Second causes of action are pled against "Defendant City of New York," but the City of New York is not a party to this case.  The ambiguity ultimately need not be resolved because none of Plaintiff's claims survive summary judgment as to any Defendant.

[6] Unless otherwise indicated, case quotations omit all internal citations, quotation marks, footnotes and omissions, and adopt alterations.

the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"It is the movant's burden to show that no genuine factual dispute exists" and a court "must resolve all ambiguities and draw all reasonable inferences in the non-movant's favor." *Vt. Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004). If the movant has met its burden, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts" and, toward that end, "must come forward with specific facts showing that there is a *genuine issue for trial*." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). The nonmoving party may not rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986). "When parties cross-move for summary judgment, each motion is analyzed separately, in each case construing the evidence in the light most favorable to the non-moving party." *Capitol Recs., LLC v. Vimeo, Inc.*, 125 F.4th 409, 418 (2d Cir. 2025).

## II.    DISCRIMINATION CLAIMS

Plaintiff asserts claims for discrimination under Title VII, the ADA, NYSHRL, and NYCHRL. *See* Compl. at 7–11. The Complaint tautologically alleges that Defendants violated those laws by discriminating against Plaintiff, without providing specificity as to the theories of liability that Plaintiff pursues. *See, e.g., id.* ¶ 61 ("Defendants engaged in unlawful employment practices prohibited by [Title VII] by discriminating against Plaintiff because of her pregnancy and sex/gender."); *id.* ¶ 73 ("Defendants engaged in an unlawful discriminatory practice by discriminating against Plaintiff because of his [*sic*] disability."). Nevertheless, generously interpreting the assorted allegations in the inartfully pled Complaint, the Court construes Plaintiff

18

to allege discrimination claims based on theories of (1) adverse employment action and (2) failure to accommodate. *See e.g., id.* ¶ 33 ("[N]ot only was [*sic*] Defendants refusing to engage in the interactive process or provide Ms. Baker a reasonable accommodation, Defendants was [*sic*] also engaging in adverse employment actions by attempting to force Ms. Baker to take unpaid leave."). For the reasons set forth below, Plaintiff's discrimination claims fail under both of these theories as applied to every cause of action.

### A. Title VII Discrimination Claims

Title VII makes it unlawful "for an employer . . . to discriminate against any individual . . . because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). In 1978, Congress enacted the Pregnancy Discrimination Act (the "PDA"), which provides that Title VII's phrase "because of sex" includes "because of . . . pregnancy, childbirth, or related medical conditions." *Id.* § 2000e(k); *Lenzi v. Systemax, Inc.*, 944 F.3d 97, 103 n.2. (2d Cir. 2019). "Title VII encompasses [the PDA]", and courts treat Title VII pregnancy discrimination claims and PDA claims as synonymous. *E.E.O.C. v. Vamco Sheet Metals, Inc.*, No. 13-CV-06088 (JPO), 2014 WL 2619812, at *6 (S.D.N.Y. June 5, 2014); *see also Lenzi*, 944 F.3d at 103 n.2 (noting that "PDA claims are themselves Title VII claims" and renaming plaintiff's Title VII claim as a PDA claim).

"Like other Title VII discrimination claims, pregnancy discrimination may be proven under a disparate treatment or disparate impact theory of liability." *Legg v. Ulster Cnty.*, 820 F.3d 67, 72 (2d Cir. 2016). Plaintiff specifies neither, but the Court construes her to rely on a disparate treatment theory because her arguments are consistent with only that theory. A plaintiff may base a disparate treatment claim on an allegation that she suffered an adverse employment action on account of her pregnancy. *See Reach v. Healthfirst, Inc.*, No. 23-CV-08085 (JPO), 2024 WL 4493769, at *2 (S.D.N.Y. Oct. 15, 2024). Additionally, the Supreme

Court has held that under the PDA, a Plaintiff may bring a Title VII disparate treatment claim based on her employer's failure to accommodate her pregnancy. *See Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 229 (2015). The Court construes Plaintiff to bring disparate treatment claims under both theories and concludes that she can succeed on neither.

### 1. The *McDonnell Douglas* Framework

Disparate treatment claims brought under Title VII are subject to the three-step burden-shifting framework adopted in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See, e.g.*, *Nieblas-Love v. N.Y.C. Hous. Auth.*, 165 F. Supp. 3d 51, 65-66 (S.D.N.Y. 2016). Under that framework, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination. *See* 411 U.S. at 802. To establish a *prima facie* case under Title VII, a plaintiff must show that: (1) she was a member of a protected class; (2) she was competent to perform the job in question or was performing the job duties satisfactorily; (3) she suffered a materially adverse employment action; and (4) the action occurred under circumstances that give rise to an inference of discrimination. *See, e.g.*, *Jeune v. City of New York*, No. 11-CV-07424 (JMF), 2014 WL 83851, at *4 (S.D.N.Y. Jan. 9, 2014).

If the plaintiff makes out a *prima facie* case, "the burden shifts to the defendant to articulate some legitimate, non-discriminatory reason for its action." *Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008). If the defendant does so, the plaintiff "may no longer rely on the presumption raised by the prima facie case," but rather must present evidence either that "the employer's stated reason for the adverse employment action is entirely pretextual" or that unlawful discrimination was a "motivating factor" in the defendant's employment decision. *Id.* at 138, 141.

The requirements change slightly for a disparate treatment claim based on an employer's failure to accommodate an employee's pregnancy. A plaintiff may make out a *prima facie* of

pregnancy discrimination by showing: "[1] that she belongs to the protected class, [2] that she sought accommodation, [3] that the employer did not accommodate her, and [4] that the employer did accommodate others similar in their ability or inability to work." *Young*, 575 U.S. at 229. "The employer may then seek to justify its refusal to accommodate the plaintiff by relying on legitimate, nondiscriminatory reasons for denying her accommodation." *Id.* "If the employer offers an apparently legitimate, non-discriminatory reason for its actions, the plaintiff may in turn show that the employer's proffered reasons are in fact pretextual." *Id.*

### 2. Plaintiff Cannot Rebut Defendants' Non-Discriminatory Reason for the Adverse Employment Action

Plaintiff attempts to make out a *prima facie* case of pregnancy discrimination by showing that The Bridge placed her on unpaid leave almost immediately after learning she was pregnant. *See* Dkt. No. 97 (Pl.'s Opp.) at 14–18.[7] Her claim must fail because, even assuming that Plaintiff can show she was qualified for the job, that her unpaid leave constitutes an adverse employment action, and that the temporal proximity between the adverse action and her pregnancy announcement creates an inference of discrimination, she can point to no evidence that rebuts the non-discriminatory explanation proffered by Defendants—that The Bridge placed Plaintiff on leave because she did not meet her position's requirement to be fully available for in-person work.[8]

---

[7] The factual predicate for this argument is questionable, given that somewhere between six and eight weeks passed between these events, and the record shows that, as of July 22, 2021, Plaintiff's supervisors, knowing of her pregnancy, were engaging with her on return-to-office scheduling on the same basis as any other employee. *See* Pl.'s Rep. 56.1 ¶ 63, 66–67.

[8] The Court declines to undertake this analysis under the qualification prong of the *prima facie* test. Notably, the qualification prong under Title VII differs from the facially similar prong under the ADA, which the parties do not appear to recognize. *See Kovaco v. Rockbestos-Surprenant Cable Corp.*, 834 F.3d 128, 136 (2d Cir. 2016). Under Title VII, "a plaintiff may satisfy this burden by showing that she possesses the basic skills necessary for performance of the job," and for employees who have already been hired, the burden is ordinarily not difficult to satisfy. *Id.* "The asserted failure of an employee to meet requirements other than possession of the basic skills of the job is properly assessed when

Defendants have amply shown that The Bridge required workers in Plaintiff's position to be available for in-person work in the community. The job description specifies that Plaintiff's role carries "travel" requirements involving the provision of services in the field, *see* Dkt. No. 96-10 at Defendants_0003-0004, and Plaintiff understood these requirements before she took the job, *see* Pl.'s Rep. 56.1 ¶¶ 49–50. Although the COVID-19 pandemic necessarily altered in-person expectations on an emergency basis, the April 28, 2021 "Return to Fieldwork" email and letter leave no doubt that the in-person requirement was in force when Plaintiff informed The Bridge in September 2021 that she could work only remotely. *See* Pl.'s Rep. 56.1 ¶ 59; Dkt. No. 96-16 at Defendants_001696. And the September 14 Email makes clear that Plaintiff's leave resulted from her failure to make herself available for in-person work. Pl.'s Rep. 56.1 ¶ 73. Plaintiff's inability or unwillingness to abide by the in-person requirement is a legitimate, non-discriminatory reason for placing her on leave. *See Feinerman v. T-Mobile USA*, No. 08-CV-03517, 2010 WL 331692, at *11 (S.D.N.Y. Jan. 28, 2010) ("[U]nwillingness to comply with the requirements of her position amounts to a legitimate, nondiscriminatory reason to terminate her.").

Plaintiff offers no evidence that Defendants' proffered explanation is pretextual. To demonstrate pretext, a plaintiff must offer evidence that the defendant's proffered "reason was false, and that discrimination was the real reason." *Sanchez v. Connecticut Natural Gas Co.*, 421 F. App'x 33 (2d Cir. 2011). "[T]emporal proximity alone is not enough to establish pretext in this Circuit." *Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 254 (2d Cir. 2014). Nothing in the

---

evaluating the employer's stated neutral reason for termination." *Luzunaris v. Baly Cleaning Servs.*, No. 23-CV-11137 (GHW) (RFT), 2024 WL 3926708, at *8 (S.D.N.Y. July 29, 2024), *report and recommendation adopted.*, 2024 WL 3925919 (S.D.N.Y. Aug. 22, 2024) (quoting *Westchester BMW, Inc.*, 398 F. Supp. 2d 281, 290-91 (S.D.N.Y. 2005)).

record provides even the slightest indication that the decision to place Plaintiff on leave was motivated by animus toward her sex or her pregnancy. Plaintiff points to no examples of invidious comments or otherwise discriminatory conduct, nor does she identify any employees outside of her protected class who were treated better in similar circumstances. She appeals to testimony from Vindeni suggesting that an immunocompromised person working for the FACT team would have been permitted to work remotely. Pl.'s Opp. at 18–19. But the cited testimony reflects only Vindeni's appraisal of a hypothetical scenario, not an actual comparator. *See* Vindeni Dep. 74:23–75:19. Moreover, the situation discussed in that testimony was hypothesized to arise in March 2020—after DOHMH issued guidance to deliver services "remotely as much as possible" and before The Bridge ordered the resumption of in-person expectations based at least in part on revised guidance from DOHMH. *See id.*; Pl.'s Rep. 56.1 ¶¶ 40–41, 59. Further, the hypothetical immunocompromised employee was assumed to have submitted sufficient medical documentation to explain their disability, unlike Plaintiff. *See* Vindeni Dep. 75:4–9. Thus, even if the imagined employee were real, and The Bridge responded in the way Vindeni speculated that it would, Plaintiff has not established that the employee was similarly situated to her. "Without evidence showing that other employees' circumstances were similar to hers, [Plaintiff] cannot not rely on them as comparators to demonstrate pretext." *Howard v. Consol. Edison Co. of N.Y., Inc.*, No. 22-1706, 2023 WL 8270808, at *2 (2d Cir. Nov. 30, 2023)).

The rest of the record makes Plaintiff's evidentiary deficiencies even more glaring. Not only can she offer no evidence of pretext, Defendants' several accommodation proposals contradict any suggestion of sex-based or pregnancy-based animus because they show that Defendants had no objection to Plaintiff continuing to work at The Bridge while pregnant (in

fact, Defendants labored to find a solution that would allow her to do so). *See* November 10

Email; November 18 Email; December 9 Email; December 30 Email. Rather, Defendants

objected only to Plaintiff working fully remotely in the RN position on the FACT team, in

violation of the known duties of that job and the requirements of The Bridge's regulators and

contractual partners. Everything considered, no rational jury could conclude that Defendants

acted with a discriminatory motive related to Plaintiff's sex or pregnancy, and her Title VII

discrimination claim fails.

### 3. Plaintiff Cannot Show that the Failure to Accommodate Was Discriminatory

Nor can Plaintiff make out a Title VII failure-to-accommodate claim because she

presents no evidence that The Bridge "accommodate[d] others similar in their ability or inability

to work." *Young*, 575 U.S. at 229. Contrasted with this case, the facts of *Young* illustrate why

Plaintiff has failed to me her burden. The employee in *Young* was a delivery driver for UPS

whose job requirements including lifting packages weighing up to 70 pounds. *Id.* at 211. After

she became pregnant, Young's doctor told her not to lift more than 20 pounds in the first 20

weeks of her pregnancy and not more than 10 pounds after that. *Id.* UPS did not allow Young to

work during her pregnancy because she could not meet her job's lifting requirements, so Young

took unpaid leave. *Id.* at 211, 215. The Court held that Young could rebut UPS's proffered non-

discriminatory explanation because she presented evidence that "UPS accommodates most

nonpregnant employees with lifting limitations while categorically failing to accommodate

pregnant employees with lifting limitations." *Id.* at 230. Nothing of that sort is presented here.

Plaintiff has adduced absolutely no evidence that The Bridge granted *anyone* an accommodation

to work fully remotely after in-person expectations resumed on July 1, 2021, let alone evidence

that The Bridge "accommodates a large percentage of nonpregnant workers while failing to

accommodate a large percentage of pregnant workers." *Id.* at 229. Nor does she offer any other circumstantial evidence that the alleged failure to accommodate was discriminatory; to the contrary, the record is replete with evidence of Defendants' efforts to accommodate Plaintiff, although not in the specific way she wanted. Her Title VII failure-to-accommodate claim therefore fails.

### B. ADA Discrimination Claims

The ADA prohibits discrimination "on the basis of disability in regard to . . . [the] discharge of employees . . . and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). "Disability discrimination claims under the ADA 'may be brought under a theory of adverse employment action or of failure to provide reasonable accommodation.'" *Gilani v. Deloitte LLP*, No. 23-CV-04755 (JMF), 2024 WL 4042256, at *5 (S.D.N.Y. Sept. 4, 2024) (quoting *Samuels v. City of New York*, No. 22-CV-01904 (JGK), 2023 WL 5717892, at *6 (S.D.N.Y. Sept. 5, 2023)). As with her Title VII discrimination claims, here Plaintiff relies on both theories and fails to establish a case under either.

#### 1. The *McDonnell Douglas* Framework

The *McDonnell Douglas* burden shifting framework also governs discrimination claims under the ADA. *See McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92, 96 (2d Cir. 2009). To establish a *prima facie* case of discrimination under the ADA based on an adverse employment action, "a plaintiff must show that: (1) her employer is subject to the ADA; (2) she was disabled within the meaning of the ADA; (3) she was otherwise qualified to perform the essential functions of her job, with or without reasonable accommodation; and (4) she suffered adverse employment action because of her disability." *Gorbea v. Verizon New York Inc.*, No. 20-3486, 2021 WL 4851389, at *2 (2d Cir. Oct. 19, 2021) (quoting *Woolf v. Strada*, 949 F.3d 89, 93 (2d Cir. 2020)). "Similarly, to establish a prima facie case for failure to provide a reasonable

accommodation, a plaintiff also must satisfy the first three factors, but for the fourth factor, she must show by a preponderance of the evidence that her employer refused to make a reasonable accommodation." *Id.* (quoting *Woolf*, 949 F. 3d at 89).

If the plaintiff establishes a *prima facie* case under an adverse employment action theory, the burden shifts to the employer to demonstrate a legitimate, non-discriminatory reason for the action, and if the employer does so, the burden shifts back to the plaintiff to show that the proffered explanation is pretextual. *Id.* In the case of a failure to accommodate, the burden shifts to the employer to show that it cannot reasonably accommodate the plaintiff without undue hardship. *McMillan v. City of New York*, 711 F.3d 120, 127-128 (2d Cir. 2013).

### 2. Plaintiff Could Not Perform the Essential Functions of Her Job

Plaintiff argues that her "high risk" pregnancy rendered her disabled within the meaning of the ADA, and that Defendants discriminated against her by refusing to accommodate her disability and by placing her on unpaid leave. Dkt. No. 97 at 3, 19. However, she cannot establish a *prima facie* case of ADA discrimination under either an adverse action theory or failure-to-accommodate theory because the record establishes that she could not perform the essential functions of her job with or without a *reasonable* accommodation.[9]

### i. In-Person Work Was an Essential Function of Plaintiff's Job

To determine the essential functions of a job, courts in this Circuit "conduct[] a fact-specific inquiry into both the employer's description of a job and how the job is actually performed in practice," in which they "draw[ ] all inferences in favor of the non-moving party."

---

[9] The parties dispute whether Plaintiff was a person with a disability under the meaning of the ADA at the time she was placed on leave. *See* Dkt. No. 96-1 at 6; Dkt. No. 97 at 4. The Court need not decide this prong because, even assuming for purposes of this motion that Plaintiff was a person with a disability at the time of her termination, she cannot establish a *prima facie* case for failure to accommodate or adverse employment action because she was unable to perform the essential functions of her job.

*Tafolla v. Heilig*, 80 F.4th 111, 119 (2d Cir. 2023) (quoting *McMillan v. City of New York*, 711

F.3d 120, 126 (2d Cir. 2013)).  Factors relevant to whether an aspect of a job is an essential

function "include the employer's judgment, written job descriptions, the amount of time spent on

the job performing the function, the mention of the function in a collective bargaining agreement,

the work experience of past employees in the position, and the work experience of current

employees in similar positions." *McMillan*, 711 F.3d at 126 (citing *Stone v. City of Mount*

*Vernon*, 118 F.3d 92, 97 (2d Cir. 1997)).  In assessing whether a job function is essential, "a

court must give considerable deference to an employer's judgment regarding what functions are

essential for service in a particular position." *Shannon v. N.Y.C. Transit Auth.*, 332 F.3d 95, 100

(2d Cir. 2003) (quoting *D'Amico v. City of New York*, 132 F.3d 145, 151 (2d Cir.1998)).

　　　Here, no rational jury could find that in-person work was not an essential function of

Plaintiff's job at the time she requested the accommodation.  The relevant evidence can support

only the conclusion that an essential function of the RN role on the FACT team was to provide

in-person services to the FACT team's clients.  Most clearly, The Bridge's job description for the

RN position explicitly states that the "essential position functions" include providing "80 percent

of treatment contacts *in the community*."  Dkt. No. 96-10 at Defendants_0003-04 (emphasis

added).  Far from arbitrary, this requirement flows directly from the OMH's guidelines for ACT

providers.  *See* Pl.'s Rep. 56.1 ¶ 25.  Further, the testimony of Silver and Vindeni demonstrate

The Bridge's well-supported judgment that in-person work was essential to the RN's role on the

FACT team.  As they testified, the RN's job responsibilities, including taking vitals during health

assessments, combined with the special needs of the clients, such as their diminished functioning

and lack of resources, necessitate that the RN perform at least some services in-person with the

clients.  *See id.* ¶¶ 34–38 and the testimony cited therein.  Plaintiff's own experience and the

experience of other nurses reinforce that conclusion.  Even at the height of the COVID-19 pandemic, nurses continued providing services in the field, and Plaintiff never worked under a fully remote arrangement.  *Id.* ¶ 52–57.  While The Bridge permitted workers to perform some services remotely during the pandemic, pursuant to a suspension of normal requirements by OMH and DOHMH due to a public health emergency, that temporary adjustment to work expectations does not deprive in-person work of its status as an essential function.  *See Balchan v. N.Y.C. Hous. Auth.*, No. 21-CV-10326 (JGK), 2025 WL 588021, at *8 (S.D.N.Y. Feb. 24, 2025) ("[T]he fact that NYCHA voluntarily modified the plaintiff's job duties from April 2020 to July 2021 does not render fieldwork a non-essential function of the plaintiff's position.").

Notably, despite how she characterizes her arguments, Plaintiff does not dispute that in-person work was an essential function of her job.  Rather, she vigorously contends that others could have performed in-person services in her stead.  *See, e.g.,* Pl.'s Rep. 56.1 ¶¶ 2, 96.  But that argument goes to potential accommodations (and is also meritless on that point, as explained further below), not whether in-person work was an essential function of the job.  *See Hunt-Watts v. Nassau Health Care Corp.*, 43 F. Supp. 3d 119, 129 (E.D.N.Y. 2014) ("Plaintiff cites no authority, and the Court finds none, for the proposition that simply because one did not perform all of the essential functions of a position, those functions are not essential."); *Sheafe-Carter v. Donohue*, No. 11-CV-04128, 2013 WL 4458746, at *6 (E.D.N.Y. Aug. 16, 2013), *aff'd sub nom. Sheafe-Carter v. Donahoe*, 579 F. App'x 44 (2d Cir. 2014) ("[T]he Second Circuit has made it clear that the suggestion that the essential requirements might be waived or that coworkers might perform the [functions] is not a suggestion for reasonable accommodation since these tasks were essential functions of the job.").

Plaintiff's argument that in-person work was not an essential function of the job because "Defendants actually offered [Plaintiff] a job without community work," *see* Dkt. No. 100 at 5, similarly goes to the issue of accommodations and says nothing about the essential functions of Plaintiff's job (as opposed to the essential functions of whatever alternative job assignment she may have been offered). *See Atencio v. United States Postal Serv.*, 198 F. Supp. 3d 340, 360 (S.D.N.Y. 2016) ("[E]vidence that accommodations were made so that an employee could avoid a particular task merely shows the job could be restructured, not that the function was non-essential." (quoting *Phelps v. Optima Health, Inc.*, 251 F.3d 21, 26 (1st Cir. 2001)).

Separately, Plaintiff's assertion that some health assessments could be performed virtually is supported only by a highly inappropriate citation to an attorney's immaterial remark at a deposition, which, even if material, would not rebut the evidentiary support recounted above that in-person work was essential more broadly. *See* Pl.'s Rep. 56.1 ¶ 37.

### ii.  Plaintiff's Requested Accommodation Required Eliminating an Essential Function of the Job

"A reasonable accommodation can never involve the elimination of an essential function of a job." *Shannon*, 332 F.3d 95 at 100.  By definition, Plaintiff's request for fulltime remote work required that her in-person work be eliminated.  Because in-person work was an essential function of the job, the requested accommodation was not reasonable, and Plaintiff cannot establish the third factor in the *prima facie* test—that she was otherwise qualified to perform the essential functions of her job, with or without reasonable accommodation.

### iii.  Plaintiff Adduces No Evidence of Any Other Reasonable Accommodation

Plaintiff suggests that other workers could have performed more in-person services to accommodate Plaintiff's requirements for remote work.  *See* Dkt. No. 97 at 9.  Regardless of whether The Bridge *could* have assigned Plaintiff's in-person duties to other employees—

29

including the LPN on the FACT team and the RNs on the other ACT teams—requiring another employee to perform the essential functions of a disabled worker's job is not a reasonable accommodation. *See Stevens v. Rite Aid Corp.*, 851 F.3d 224, 231 (2d Cir. 2017); *Gilbert v. Frank*, 949 F.2d 637, 644 (2d Cir. 1991) (holding that reassigning the essential functions of a plaintiff's job is not a reasonable accommodation).

Alternatively, as proof that Defendants could have accommodated her with a fully remote job, Plaintiff points to Defendants' offer to transfer her to the Residential Services Department, which was provided in the November 18 Email. *See* Dkt. No. 97 at 8. Any reliance on that evidence is futile for showing that Defendants could have made Plaintiff's position fully remote because: (1) the offer was for an entirely different job; (2) the reassignment would have dispensed with the requirement for fieldwork, not the requirement for in-person work; and (3) any accommodation to make Plaintiff's position fully remote would necessarily be unreasonable since it would eliminate an essential function of the job. The evidence is equally futile to the extent Plaintiff seeks to show that Defendants should have accommodated her by transferring her to a different position. First, Plaintiff rejected the offer that was made for a different position, Pl.'s Rep. 56.1 ¶ 106, and rather than showing that Defendants withheld any reasonable accommodations, the offer shows Defendants' good faith attempts to accommodate her. Second, while reassignment to a vacant position can be a reasonable accommodation, *Coleman v. N.Y.C. Dep't of Health & Mental Hygiene*, No. 20-CV-10503 (DLC), 2022 WL 704304, at *4 (S.D.N.Y. Mar. 9, 2022), Plaintiff has offered no evidence to meet her burden to show "the existence of a vacant position for which she [was] qualified," *McBride,* 583 F.3d at 97, other than the one she rejected. Plaintiff therefore fails the third prong of the *prima facie*

case, which applies to both her adverse action and failure-to-accommodate theories. Her discrimination claim under the ADA thus fails.[10]

### C.  NYSHRL and NYCHRL Claims

NYSHRL and NYCHRL prohibit discrimination on the basis of a protected class, including sex and disability. *See* N.Y. Exec. Law § 296(1)(a); N.Y. City Admin. Code § 8–107(1). As under Title VII, pregnancy discrimination constitutes discrimination on the basis of sex under both NYSHRL and NYCHRL. *Romero v. St. Vincent's Servs., Inc.*, No. 22-1476-CV, 2023 WL 3477161, at *2 (2d Cir. May 16, 2023). Additionally, NYSHRL makes it unlawful for an employer to refuse to provide a reasonable accommodation for an employee's disability or pregnancy-related condition, *see* N.Y. Exec. Law § 296(3)(a), and NYCHRL makes it unlawful for an employer to refuse to provide a reasonable accommodation for an employee's disability, pregnancy, or pregnancy-related condition. N.Y. City Admin. Code §§ 8–107(15), 8–107(22). Although these claims are not all subject to the exact same standards as Plaintiff's claims under Title VII and the ADA, they fail due to the same evidentiary deficiencies.

### 1.  Adverse Employment Action—Plaintiff Cannot Establish Discriminatory Motive

Courts formerly analyzed NYSHRL discrimination claims under the Title VII standard, but following a 2019 amendment by the New York State Legislature, courts analyze NYSHRL claims under the less demanding standard of the NYCHRL. *See Forbes v. Tri-Cnty. Care, LLC*, No. 21-CV-01366 (JHR), 2025 WL 743945, at *9 (S.D.N.Y. Mar. 7, 2025). Under that standard, "Plaintiff may prove an adverse employment action simply by showing that she was treated 'less

---

[10] Plaintiff's claim fares no better if applied to the other offers to accommodate her needs that she also rejected. *See* November 18 Email (remain in current position with 3 days remote and 2 days in community); December 9 Email (remain in current position with 3 days in the office and 2 days remote); December 30 Email (remain in current role but at a different location with a shorter commute).

well.'" *Id.* (quoting *Emamian v. Rockefeller Univ.*, 971 F.3d 380, 390 (2d Cir. 2020)).

Nevertheless, "[e]ven under the more lenient standards of the NYCHRL and NYSHRL, the

plaintiff must show that she was treated less well because of a discriminatory motive." *Valerio*

*v. Metro. Transp. Auth.*, No. 23-CV-01938 (DLC), 2024 WL 2305386, at \*9 (S.D.N.Y. May 20,

2024), *aff'd,* No. 24-1614, 2025 WL 686028 (2d Cir. Mar. 4, 2025).  As explained above, the

evidence shows that discriminatory motive played no role in placing Plaintiff on leave.  Her

NYSHRL and NYCHRL discrimination claims therefore fail on a theory of adverse employment

action.  *See id.*; *Thompson v. Shutterstock, Inc.*, No. 23-CV-04155 (JGLC), 2025 WL 2720410,

at \*10 (S.D.N.Y. Sept. 24, 2025).

### 2. Failure to Accommodate—Plaintiff Could Not Perform the Essential Functions of Her Job

"Although NYSHRL discrimination claims under § 296(1)(a) are subject to Title VII

standards, pregnancy-related accommodation claims under § 296(3)(a) are 'governed by the

same legal standards as govern federal [ADA] claims.'" *Bethea v. Winfield Sec. Corp.*, No. 23-

CV-00922 (AT), 2024 WL 2783753, at \*2 (S.D.N.Y. May 29, 2024) (quoting *Graves v. Finch*

*Pruyn & Co.*, 457 F.3d 181, 184 n.3 (2d Cir. 2006).  Accordingly, as with her ADA claim,

Plaintiff's NYSHRL failure-to-accommodate claim fails because she cannot show that she could

perform the essential functions of the job.

Under the NYCHRL, like the ADA and NYSHRL, "a plaintiff who cannot perform the

essential functions of his job with a reasonable accommodation cannot succeed on a failure-to-

accommodate claim." *Abdelsayed v. N.Y. Univ.*, No. 23-1144, 2024 WL 2828414, at \*1 (2d Cir.

June 4, 2024) (citing *Jacobsen v. N.Y.C. Health & Hosps. Corp.*, 22 N.Y.3d 824, 834–35

(2014)).  However, the "employer, not the employee, has the pleading obligation to prove that

the employee could not, with reasonable accommodation, satisfy the essential requisites of the

job." *Brown v. N.Y.C. Dep't of Educ.*, 806 F. App'x 45, 49 (2d Cir. 2020) (quoting *Romanello v. Intesa Sanpaolo, S.p.A.*, 22 N.Y.3d 881, 885 (N.Y. 2013)).  Defendants have met that burden. Based on evidence proffered by Defendants of the job description for Plaintiff's position, the relevant OMH guidelines, the judgment of the employer, and the experience of those in the position, no rational jury could find providing services in-person at least some portion of the workweek was not an essential function of Plaintiff's job.  As Plaintiff claimed she could perform no in-person services, or, later in her pregnancy, extremely limited in-person services, she necessarily could not perform the essential functions of her job with any reasonable accommodation.  *See Snowden v. Trs. of Columbia Univ.*, 612 F. App'x 7, 10 (2d Cir. 2015) (affirming dismissal of failure to accommodate claims under the NYCHRL where, as here "even with the burden resting on the employer, as it does under the NYCHRL—[Plaintiff] could not perform the essential functions of her position, with or without a reasonable accommodation").  Her failure to accommodate claims fail.

Finally, as Plaintiff has failed to establish any primary liability for discrimination, her aiding and abetting claims must also be dismissed.

### D. Defendants Engaged in the Interactive Process

Plaintiff argues that Defendants failed to engage in the interactive process regarding her requested disability accommodation because they made no effort to accommodate her before placing her on leave.  *See* Dkt. No. 94 at 22.  "Where the employee's disability is known to the employer, the ADA envisions an 'interactive process' by which employers and employees work together to assess whether an employee's disability can be reasonably accommodated."  *Stevens*, 851 F.3d at 231.  There is no freestanding "cause of action under the ADA or NYSHRL for a failure to engage in an interactive process."  *Greenbaum v. N.Y.C. Transit Auth.*, No. 21-1777, 2022 WL 3347893, at *5 (2d Cir. Aug. 15, 2022).  Rather, "an employer's failure to engage in a

good faith interactive process can be introduced as evidence tending to show disability

discrimination." *Sheng v. M&TBank Corp.*, 848 F.3d 78, 87 (2d Cir. 2017). However, "in

contrast to federal and New York State law . . . a failure to engage in the interactive process is

independently actionable as a separate claim under the NYCHRL." *Greenbaum*, 2022 WL

3347893 at *5.

Plaintiff's arguments regarding the interactive process cannot save her ADA or NYSHRL

claims because "[e]ven where the employer is required to engage in an interactive process, an

employee may not recover based on her employer's failure to engage in an interactive process if

she cannot show that a reasonable accommodation existed at the time of her dismissal." *Johnson*

*v. L'Oreal USA*, No. 21-2914-CV, 2023 WL 2637456, at *6 (2d Cir. Mar. 27, 2023). As

explained above, Plaintiff presents no evidence that any reasonable accommodation existed,

other than those that were offered and rejected by her.

Nor can Plaintiff's assertions establish a claim under the NYCHRL (which, in any event,

Plaintiff never pled). Plaintiff cites to N.Y.C. Admin. Code § 8-107(28)(a), *see* Dkt No. 94 at

22, which provides in relevant part, that "[i]t shall be an unlawful discriminatory practice for an

employer . . . to refuse or otherwise fail to engage in a cooperative dialogue within a reasonable

time with a person who has requested an accommodation." N.Y.C. Admin. Code § 8-107(28)(a).

The NYCHRL defines "cooperative dialogue" as "the process by which a covered entity and a

person entitled to an accommodation, or who may be entitled to an accommodation . . . engage in

good faith in a written or oral dialogue concerning the person's accommodation needs; potential

accommodations that may address the person's accommodation needs, including alternatives to a

requested accommodation; and the difficulties that such potential accommodations may pose for

the covered entity." N.Y.C. Admin. Code § 8-102.

In the September 14 Email, Silver responded to Plaintiff's September 9 request for fully remote work, explained that the requested arrangement was not possible because the RN position is an in-person, community-based position, and identified FMLA leave as the most appropriate solution. "[T]he NYCHRL requires only that Defendants engage in an interactive process with the disabled individual; it does not require that the individual be satisfied with that process or that the process result in the individual's preferred accommodation.". *Stuart v. T-Mobile USA, Inc.*, No. 14-CV-04252 (JMF), 2015 WL 4760184, at *11 (S.D.N.Y. Aug. 12, 2015). There is no evidence to suggest that Defendants engaged in anything other than a good faith dialogue. *See Rochelle v. AutoZoners, LLC*, No. 21-CV-01220 (PMH), 2023 WL 5935835, at *16 (S.D.N.Y. Sept. 12, 2023) (granting summary judgment to defendants on a cooperative dialogue claim where the employer offered an extended period of unpaid leave). Moreover, Defendants continued to engage with Plaintiff throughout her pregnancy, offering alternative accommodations on no less than four occasions in response to Plaintiff's repeated rejections. *See* November 10 Email; November 18 Email; December 9 Email; December 30 Email. If anything, it was Plaintiff who did not engage in cooperative dialogue, as her refusals were based not on the needs created by her purported disability, but on her job preferences. *See, e.g.,* Pl.'s Rep. 56.1 ¶ 102 (responding to the question in the November 10 Email asking whether she could work in a position that required in-office work but no field work, Plaintiff writes, "I would not know as I don't know which position you are offering me"). Defendants' failure to offer Plaintiff her desired accommodation does not create liability under the NYCHRL. *See Balchan*, 2025 WL 588021, at *9 (S.D.N.Y. Feb. 24, 2025) ("The NYCHRL does not require an employer to 'give the employee what the employee is demanding.'") (quoting *Hosking v. Mem'l Sloan-Kettering Cancer Ctr.*, 186 A.D.3d 58, 66, 126 N.Y.S.3d 98, 104 (2020)).

## III.    RETALIATION CLAIMS

Plaintiff alleges that in response to her filing a grievance in connection with the denial of her accommodation request, Defendants retaliated against her by failing to reinstate her pay.  *See* Dkt. No. 97 at 23.  Because there is no evidence of retaliatory motive, Plaintiff's retaliation claims fail.

### A.  Title VII and the ADA

Retaliation claims under Title VII and the ADA are analyzed under the familiar *McDonnell Douglas* burden-shifting framework.  *Jones-Cruz v. Brookdale Hosp. Med. Ctr.*, No. 19-CV-06910 (MMG), 2025 WL 1617193, at *6, *11 (S.D.N.Y. June 6, 2025) (ADA); *Smith v. City of New York*, 385 F. Supp. 3d 323, 345 (S.D.N.Y. 2019) (Title VII).  Thus, if Plaintiff establishes a *prima facie* case of retaliation, "the burden shifts to Defendant to show a legitimate, non-retaliatory rationale.  If Defendants can provide such proof of a non-retaliatory motivation, then in order to avoid summary judgment, Plaintiff must show that the proffered non-retaliatory reason is pretextual."  *Jones-Cruz*, 2025 WL 1617193, at *11.  To establish a *prima facie* case of retaliation, a plaintiff must show: "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action."  *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010) (quoting *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005)).

Plaintiff fails to make out a *prima facie* case of retaliation because any alleged retaliatory action predated her alleged protected activity.  The Bridge placed Plaintiff on unpaid administrative leave on September 24, 2021, Defs' Sur-Rep. 56.1 ¶ 197, and Baker's grievance was filed on September 26, 2021, *id.* ¶ 199.  "It is well-settled that an adverse employment action cannot serve as the basis for a retaliation claim if the action was set in motion before a plaintiff

engaged in protected activity." *Cayemittes v. City of N.Y. Dep't of Hous. Pres. & Dev.*, 974 F. Supp. 2d 240, 262 (S.D.N.Y. 2013), *aff'd*, 641 F. App'x 60 (2d Cir. 2016). Defendants' so-called failure to reinstate Plaintiff's pay is simply the necessary consequence of placing her on unpaid leave, not an independent retaliatory act. Moreover, as explained in detail with respect to Plaintiff's discrimination claims, Defendants have established a non-discriminatory reason for placing Plaintiff on leave—she could not perform the essential duties of her job. As with her discrimination claims, Plaintiff has no evidence that even suggests Defendants' proffered reason was pretextual. To the contrary, the evidence shows that Defendants attempted to allow Plaintiff to continue earning a wage by offering several alternative working arrangements that Plaintiff ultimately declined. Accordingly, Plaintiff's Title VII and ADA retaliation claims fail.

### B. NYSHRL and NYCHRL

Plaintiff's NYSHRL and NYCHRL retaliation claims fail for substantially the same reasons. To establish a *prima facie* case of retaliation under the NYSHRL and NYCHRL, a plaintiff must prove "identical" elements to those required by the ADA "except that the plaintiff need not prove any 'adverse' employment action; instead, she must prove that something happened that would be reasonably likely to deter a person from engaging in protected activity."[11] *Wright v. City of New York*, No. 23-CV-03149 (KPF), 2024 WL 3952722, at *10 (S.D.N.Y. Aug. 27, 2024) (quoting *Leon* v. *Columbia Univ. Med. Ctr.*, No. 11-CV-08559 (NSR), 2013 WL 6669415, at *12 (S.D.N.Y. Dec. 17, 2013)). Once the plaintiff has established a *prima*

---

[11] If anything, the events after the protected activity (filing a union grievance) would not deter, but rather encourage, a person to pursue the same protected activity. Following Plaintiff's grievance, Defendants offered her multiple accommodations as an alternative to unpaid leave, including temporarily altering long-standing practices to do so—all of which were rejected by Plaintiff.

37

*facie* case, the same burden-shifting framework applies. *See Gordon v. City of New York*, No. 14-CV-06115 (JPO), 2018 WL 4681615, at *16 (S.D.N.Y. Sept. 28, 2018).

The lower burden does not help Plaintiff, however, because failure to offer any evidence of retaliatory motive is equally fatal to retaliation claims under NYSHRL and NYCHRL as under ADA-based retaliation claims. *See Jones v. City of New York*, No. 22-1867, 2023 WL 6205630, at *2 (2d Cir. Sept. 25, 2023). Her retaliation claims therefore fail.

## CONCLUSION

For the reasons stated herein, Defendants' motion for summary judgment (Dkt. No. 96) is GRANTED in its entirety, and Plaintiff's motion for summary judgment (Dkt. No. 93) is DENIED. The Clerk of Court is respectfully directed to enter judgment for Defendants and CLOSE this case.

Dated: September 30, 2025
      New York, New York

                         SO ORDERED.

                         MARGARET M. GARNETT
                         United States District Judge